UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:16-cr-00091-JAW |
| | ) | |
| JONATHAN GARDINER, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

This matter is before the Court on Defendant Jonathan Gardiner's Motion to Suppress. (ECF No. 30.) Through his motion, Defendant contends law enforcement officials searched his residence without a warrant and without consent. Defendant, therefore, seeks to exclude from trial all evidence derived from the search.

**PROPOSED FINDINGS OF FACT**

Following a hearing on the motion, and after consideration of the evidence, I recommend the Court find the following facts:

1. On November 13, 2014, at approximately 6 p.m., two deputies of the Penobscot County Sheriff's office (deputies Allen and Roy) responded to a call from a residence in Glenburn, Maine, regarding the discharge of a weapon.

2. An individual at the residence informed the officers that shots were fired outside a nearby house.

3. The house identified by the individual was Defendant's house located at 184 Lakeview Drive in Glenburn (the property).

4. When the officers arrived at the property, Deputy Allen knocked on the front door. Angela Barry appeared at the door.

5. Ms. Barry informed the officers that she was Defendant's girlfriend, and that she resided on the property with Defendant and their child. She also informed the officers that three other individuals lived on the property.

6. Ms. Barry told the officers that Defendant was not at home, that he was at work, and that he worked at Burger King.

7. When the officers advised Ms. Barry that they had received a complaint of shots fired outside the residence, Ms. Barry said she had no knowledge of any shots fired.

8. Deputy Allen asked Ms. Barry if officers could search the outside of the residence, to which search Ms. Barry consented.

9. During the search, Deputy Allen located a shooting target area in the back of the property. The officers also found some shell casings in the area.

10. Through dispatch, the officers learned that both Ms. Barry and Defendant were convicted felons. They also learned of an outstanding arrest warrant for Defendant for the failure to pay a fine.

11. When Deputy Allen reported to Ms. Barry the results of the search, Ms. Barry said she had no knowledge of the target area.

12. The officers asked Ms. Barry for consent to search the residence. Ms. Barry declined to consent to the search.

13. At approximately the same time the officers were concluding their conversation with Ms. Barry, a vehicle approached the property, but then changed direction and began to travel away from the property. Deputy Allen followed the vehicle, stopped the vehicle,

and learned the driver of the vehicle was Jennifer Marshall, one of the individuals who lived on the property. Deputy Allen returned to the property with Ms. Marshall.

14. As Deputy Allen was following Ms. Marshall's vehicle, Deputy Roy spoke with Ms. Barry at the front the house. When he was speaking with Ms. Barry, Deputy Roy heard a male voice from inside the house say "don't let him in here – they can't come in without a warrant." Ms. Barry said the person was Forrest, one of the individuals who also lived on the property. Ms. Barry then closed the door.

15. Deputy Roy then planned to wait for backup and to secure the property. As he walked to the back of the property, he observed an individual who appeared to be running from the rear of the house. Deputy Roy enlisted Deputy Allen's assistance in the pursuit of the individual, but the officers were unable to apprehend the person.

16. Sergeant Sheehan[1] arrived at the scene to assist. When Sergeant Sheehan spoke to Ms. Barry and Ms. Marshall, Ms. Barry told him that the person who was running was Forrest, but she did not know his last name.

17. When Ms. Barry and Ms. Marshall spoke with Sergeant Sheehan, Ms. Barry and Ms. Marshall consented to the search of the property. Contrary to Defendant's assertion, the scope of the consent was not limited to a search for Defendant.[2]

18. Officers then searched the house. As part of the search, Deputies Roy and Allen went into the bedroom Ms. Barry shared with Defendant. While in the bedroom, the officers observed some debris, including what appeared to be pieces of insulation, on some of

---

[1] Subsequent November 13, 2014, Sergeant Sheehan was appointed to the position of Chief Deputy with the Penobscot County Sheriff's office.

[2] Defendant contends the consent was limited to search the property for him. The officers maintain the consent was not limited as Defendant asserts. As explained below, the officers' testimony is more credible.

the items in the closet. A panel in the ceiling above the closet appeared to have some insulation hanging from it. The officers were concerned that a person had accessed the attic through the panel, and could be hiding in the attic. When the officers pointed out their observations to Ms. Barry, and asked Ms. Barry whether anyone was in the attic, she said no.

19. Deputy Roy decided to look above the ceiling panel. Ms. Barry, who could see the officers in the bedroom, did not raise any objection to the scope of the search. Deputy Roy stood on a stool and looked into the attic. He saw what appeared to be a soft firearms case, and removed the case from the attic. The case was camouflaged, and the shape and weight of the content of the case were consistent with a gun. Deputy Roy opened the case, and found a sawed-off shotgun inside the case.

20. Following the search, Ms. Barry and Ms. Marshall signed forms entitled "Permission to Search." According to the forms, Ms. Barry and Ms. Marshall authorized a search of the "Residence (Bed Room) (common areas)." The forms also stated that Ms. Barry and Ms. Marshall gave "permission to the [] officer, and any other law enforcement officer that he needs to assist him, to conduct a search of the computer, CDs, floppy discs, and zip codes."

21. When questioned by Deputy Allen about the results of the search, Ms. Barry did not assert that her consent did not include consent to search the attic or search for firearms. She did not raise any objection to the scope of the search.

22. If Ms. Barry had not consented to the search, the officers would have secured the premises and requested a warrant to conduct a search of the house.

## DISCUSSION

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973); *see also United States v. Brake*, 666 F.3d 800, 806-807 (1st Cir. 2011) (involving search of a bag); *United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008) (involving search of premises). "In order for consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily." *Jones*, 523 F.3d at 37. This turns on the totality of the circumstances involved in the interaction between the investigating officers and the consenting party. *Id.* Where consent is freely and voluntarily given, the scope of the consent remains an issue; a warrantless consent search may not exceed the scope of the consent communicated by the consenting party. *United States v. Chaney*, 647 F.3d 401, 406 (1st Cir. 2011). The scope of consent is measured by an objective standard, *i.e.*, what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Florida v. Jimeno,* 500 U.S. 248, 251 (1991).

Defendant contends the consent did not extend to the attic in part because Ms. Barry did not have the authority to consent to the search. Defendant argues the officers had no reasonable basis to believe Ms. Barry had any connection to the attic that would authorize her to consent to a search of the attic. "[C]onsent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). Contrary to Defendant's argument, Ms. Barry had common authority over the property. She lived in the home with Defendant and their minor child,

and shared a bedroom with Defendant. Consistent with the fact she resided in the home and had common authority over the property, she was present at the home with her child purportedly without Defendant when law enforcement officials arrived. The objective facts establish Ms. Barry had common authority over the property, including the attic.

Defendant argues that even if Ms. Barry had authority to consent to a search of the property, including the attic, the scope of her actual consent was limited and did not include a search of the attic. Defendant in part points to the consent form, signed by Ms. Barry after the completion of the search, which form provides the scope of the consent included the "Residence (Bed Room/Common Areas)." Defendant contends the lack of reference to the attic demonstrates the limited scope of the consent. Defendant's argument is unpersuasive. First, Sergeant Sheehan credibly testified that the scope of the search was not limited. The officers' conduct during the search, and Ms. Barry's response, or lack thereof, to the scope of the search are consistent with Sergeant Sheehan's testimony. Ms. Barry was in the vicinity of the officers during the search and did not object to the scope of the search at any time. Significantly, Ms. Barry could see the officers in the bedroom, was informed about the officers' findings in the closet, was asked by the officers whether anyone was in the attic, yet did not raise any objection to the scope of the search. Logic suggests that had Ms. Barry limited the consent as Defendant maintains, she would have objected to the scope of the officers' search. In short, the persuasive and credible evidence thus establishes that Ms. Barry's consent was not limited as Defendant asserts, and included consent to search the attic.[3]

---

[3] Courts have consistently found that a consent to search a residence is broad enough to include attached spaces such as garages, basements, and attics. *See*, *e.g.*, *United States v. Ryerson*, 545 F.3d 483, 489–90 (7th Cir. 2008) (garage); *United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008) (consent to search a house for persons authorizes a search of "every room, the sum of which is the house" (quoting *United States v. Fleck*, 413 F.3d 883, 892 (8th Cir. 2005)); *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997) (basement); *United States v. Davis*, 635 F. Supp. 2d 752, 758 (E.D. Tenn. 2009) (attic), *and compare United States v. Ibarra*, 965 F.2d 1354, 1358 (5th Cir. 1992) (en banc, per curiam opinion) (split decision upholding district court's conclusion that consent to search home did not

Defendant also contends Ms. Barry did not consent to a search of the property for firearms. Instead, Defendant maintains Ms. Barry's consent was limited to a search for Defendant. First, the credible evidence, including the testimony of the officers, establishes Ms. Barry's consent was not limited. For instance, the consent form did not provide the search was limited to a search for Defendant. In addition, even if Ms. Barry's account is accurate, in this case, the limitation is irrelevant as to the reasonableness of Deputy Roy's search of the attic. While in the bedroom, the officers observed some debris on items in the closet, which debris included what appeared to be pieces of insulation, and observed insulation hanging from a panel in the ceiling. Based on their observations, the officers reasonably could have believed a person might be in the attic. To the extent, therefore, that Ms. Barry's consent was limited to a search for Defendant, given that the officers reasonably believed a person (e.g., Defendant) could have been in the attic, the search of the attic was within the scope of the search Ms. Barry asserts she authorized.[4]

Even if Ms. Barry did not have authority to consent, or if the scope of her consent was limited as Defendant asserts, exclusion of evidence gathered in the search would not be warranted. As the First Circuit explained:

> Evidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way, so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

---

authorize officers to pry open and enter a securely boarded-up attic), *with United States v. Dominguez*, 911 F. Supp. 261, 262 (S.D. Tex. 1995), *aff'd,* 103 F.3d 126 (5th Cir. 1996) (removal of panel by unscrewing a screw to gain access to attic within scope of consent to search house).

[4] "[T]he plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015) (upholding seizure of shotgun in plain view of officer who entered premises pursuant to consent). Because Deputy Roy was lawfully in the attic, and because, as discussed more fully below, the record demonstrates probable cause for a search for a firearm, the plain view doctrine supports Deputy Roy's seizure of the gun case.

7

*United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994) (internal citations omitted). When they obtained consent for the search, the officers had received a report that shots had been fired on the property; the officers knew that Defendant and Ms. Barry, occupants of the home, were convicted felons and thus prohibited from possessing firearms; the officers had located a shooting target area on the property; the officers found empty shell casings on the property; the officers were aware there was an outstanding warrant for Defendant's arrest; one of the officers heard a male voice in the house despite Ms. Barry's assertion that Defendant was not present; and the officers observed at least one person flee from the house. The facts known to the officers would have been sufficient to establish probable cause in support of a search warrant, and given the nature of the investigation and the personnel on site (i.e., at least three law enforcement officers), I am satisfied the officers would have secured the property, requested and obtained a search warrant, and conducted a search that would have revealed the gun confiscated during the search. The evidence, therefore, would have been discovered by a means that does not offend the protections of the Fourth Amendment.

Defendant's challenge to the officers' securing and opening the case found in the attic is also unavailing. As mentioned above, the reliable evidence establishes that the scope of Ms. Barry's consent was not limited to a search for Defendant. In addition, under the circumstances, the officers were not required to obtain a warrant to open the case. "Although a person generally has an expectation of privacy in items he places in a closed container, some containers so betray their contents as to abrogate any such expectation." *United States v. Meada*, 408 F.3d 14, 22 (1st Cir. 2005). Defendant argues the case was a "soft" case and not a case that is typically used for a gun. Based on the appearance, size, shape and weight of the case, as described by the officers and as reflected in the photograph of the case, the officers could reasonably conclude the case likely contained a gun. A warrant, therefore, was not necessary.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court deny Defendant's Motion to Suppress. (ECF No. 30.)

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 6th day of January, 2017.