UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:16-cr-00091-JAW |
| | ) | |
| JONATHAN GARDINER | ) | |

**ORDER AFFIRMING THE RECOMMENDED DECISION
OF THE MAGISTRATE JUDGE**

Charged with two counts of possession of a firearm after having been previously convicted of crimes punishable for a term of more than one year of imprisonment, in violation of 18 U.S.C. § 922(g)(1), Jonathan Gardiner moves to suppress any and all evidence seized from his residence on November 13, 2014 following a warrantless search. After a de novo determination, the Court affirms the Magistrate Judge's recommended decision and concludes that the scope of the consent for the search was not limited and that it extended to the attic, and in any event, the Magistrate Judge correctly applied the inevitable discovery exception to the exclusionary rule.

## I.   PROCEDURAL BACKGROUND

On July 13, 2016, a federal grand jury indicted Jonathan Gardiner with two counts of possession of a firearm after having previously been convicted of crimes punishable for a term of more than one year of imprisonment, in violation of 18 U.S.C. § 922(g)(1). *Indictment* (ECF No. 3). Mr. Gardiner pleaded not guilty to both counts on July 20, 2016. *Min. Entry* (ECF No. 10).

On September 19, 2016, Mr. Gardiner filed a motion to suppress any and all evidence seized from his residence on November 13, 2014 following a warrantless search. *Def.'s Mot. to Suppress* (ECF No. 30). The Government responded to the Defendant's motion to suppress on October 4, 2016. *Gov't's Resp. to Def.'s Mot. to Suppress* (ECF No. 33).

On December 7, 2016, the Magistrate Judge held a suppression hearing, which was completed on December 12, 2016. *Min. Entry* (ECF Nos. 37, 49); *Tr. of Proceedings*, *Mot. to Suppress* (Dec. 7, 2016) (ECF No. 63) (*Suppression Tr.*); *Tr. of Proceedings*, *Ctd. Mot. to Suppress & Initial Appearance* (Dec. 12, 2016) (ECF No. 64) (*Ctd. Suppression Tr.*). On January 6, 2017, the Magistrate Judge issued a recommended decision in which he made twenty-two factual findings. *Recommended Decision on Mot. to Suppress* (ECF No. 59) (*Rec. Dec.*). Based on those factual findings, the Magistrate Judge concluded that the warrantless search and seizure complied with the Fourth Amendment and recommended that the Court deny Mr. Gardiner's motion to suppress. *Id.*

Mr. Gardiner objected to the recommended decision on January 23, 2017. *Def.'s Objs. to the Magistrate's Recommended Order & Decision* (ECF No. 61) (*Def.'s Objs.*). The Government responded to Mr. Gardiner's objections on January 27, 2017. *Gov't's Resp. to Def.'s Objs. to the Magistrate's Recommended Order & Decision* (ECF No. 62).

## II.   PROPOSED FACTUAL FINDINGS

On November 13, 2014, at approximately 6 p.m., two deputies of the Penobscot County Sheriff's office (Deputies Allen and Roy) responded to a call from a residence in Glenburn, Maine, regarding the discharge of a weapon.   *Rec. Dec.* ¶ 1.   An individual at the residence informed the officers that shots were fired outside a nearby house.   *Id.* ¶ 2.   The house identified by the individual was Mr. Gardiner's house located at 184 Lakeview Drive in Glenburn (the property).   *Id.* ¶ 3.

When the officers arrived at the property, Deputy Allen knocked on the front door.   *Id.* ¶ 4.   Angela Barry appeared at the door.   *Id.*   Ms. Barry informed the officers that she was Mr. Gardiner's girlfriend, and that she resided on the property with Mr. Gardiner and their child.   *Id.* ¶ 5.   She also informed the officers that three other individuals lived on the property.   *Id.*   Ms. Barry told the officers that Mr. Gardiner was not at home, that he was at work, and that he worked at Burger King.   *Id.* ¶ 6. When the officers advised Ms. Barry that they had received a complaint of shots fired outside the residence, Ms. Barry said she had no knowledge of any shots fired.   *Id.* ¶ 7.

Deputy Allen asked Ms. Barry if the officers could search the outside of the residence, to which Ms. Barry consented.   *Id.* ¶ 8.   During the search, Deputy Allen located a shooting target area in the back of the property.   *Id.* ¶ 9.   The officers also found some shell casings in the area.   *Id.*   Through dispatch, the officers learned that both Ms. Barry and Mr. Gardiner were convicted felons.   *Id.* ¶ 10.   They also learned of an outstanding arrest warrant for Mr. Gardiner for the failure to pay a fine.   *Id.*

3

When Deputy Allen reported to Ms. Barry the results of the search, Ms. Barry said she had no knowledge of the target area. *Id.* ¶ 11. The officers asked Ms. Barry for consent to search the residence. *Id.* ¶ 12. Ms. Barry declined to consent to the search. *Id.*

At approximately the same time the officers were concluding their conversation with Ms. Barry, a vehicle approached the property but then changed direction and began to travel away from the property. *Id.* ¶ 13. Deputy Allen followed the vehicle, stopped the vehicle, and learned the driver of the vehicle was Jennifer Marshall, one of the individuals who lived on the property. *Id.* Deputy Allen returned to the property with Ms. Marshall. *Id.*

As Deputy Allen was following Ms. Marshall's vehicle, Deputy Roy spoke with Ms. Barry at the front of the house. *Id.* ¶ 14. When he was speaking with Ms. Barry, Deputy Roy heard a male voice from inside the house say "don't let him in here – they can't come in without a warrant." *Id.* Ms. Barry said the person was Forrest, one of the individuals who also lived on the property. *Id.* Ms. Barry then closed the door. *Id.* Deputy Roy then planned to wait for backup and to secure the property. *Id.* ¶ 15. As he walked to the back of the property, he observed an individual who appeared to be running from the rear of the house. *Id.* Deputy Roy enlisted Deputy Allen's assistance in the pursuit of the individual, but the officers were unable to apprehend the person. *Id.*

Sergeant Sheehan arrived at the scene to assist. *Id.* ¶ 16. When Sergeant Sheehan spoke to Ms. Barry and Ms. Marshall, Ms. Barry told him that the person

who was running was Forrest, but she did not know his last name. *Id.* When Ms. Barry and Ms. Marshall spoke with Sergeant Sheehan, Ms. Barry and Ms. Marshall consented to the search of the property. *Id.* ¶ 17. Contrary to Mr. Gardiner's assertion, the scope of the consent was not limited to a search for Mr. Gardiner. *Id.*

Officers then searched the house. *Id.* ¶ 18. As part of the search, Deputies Roy and Allen went into the bedroom Ms. Barry shared with Mr. Gardiner. *Id.* While in the bedroom, the officers observed some debris, including what appeared to be pieces of insulation, on some of the items in the closet. *Id.* A panel in the ceiling above the closet appeared to have some insulation hanging from it. *Id.* The officers were concerned that a person had accessed the attic through the panel, and could be hiding in the attic. *Id.* When the officers pointed out their observations to Ms. Barry, and asked Ms. Barry whether anyone was in the attic, she said no. *Id.* Deputy Roy decided to look above the ceiling panel. *Id.* ¶ 19. Ms. Barry, who could see the officers in the bedroom, did not raise any objection to the scope of the search. *Id.* Deputy Roy stood on a stool and looked into the attic. *Id.* He saw what appeared to be a soft firearms case, and removed the case from the attic. *Id.* The case was camouflaged, and the shape and weight of the content of the case were consistent with a gun. *Id.* Deputy Roy opened the case, and found a sawed-off shotgun inside the case. *Id.*

Following the search, Ms. Barry and Ms. Marshall signed forms entitled "Permission to Search." *Id.* ¶ 20. According to the forms, Ms. Barry and Ms. Marshall authorized a search of the "Residence (Bed Room) (common areas)." *Id.* The forms also stated that Ms. Barry and Ms. Marshall gave "permission to the [] officer, and

5

any other law enforcement officer that he needs to assist him, to conduct a search of the computer, CDs, floppy discs, and zip discs." *Id.* When questioned by Deputy Allen about the results of the search, Ms. Barry did not assert that her consent did not include consent to search the attic or to search for firearms. *Id.* ¶ 21. She did not raise any objection to the scope of the search. *Id.* If Ms. Barry had not consented to the search, the officers would have secured the premises and requested a warrant to conduct a search of the house. *Id.* ¶ 22.

## III. DISCUSSION

As the Magistrate Judge's Recommended Decision is on a motion to "suppress evidence in a criminal case," 28 U.S.C. § 636(b)(1)(A), this Court reviews the Recommended Decision de novo under 28 U.S.C. § 636(b)(1)(B).

### A. Factual Objections

Mr. Gardiner makes three objections to the facts found by the Magistrate Judge. First, Mr. Gardiner objects to the Magistrate Judge's finding in paragraph 15 that "[Deputy Roy] observed an individual who appeared to be running from the rear of the house." *Def.'s Objs.* at 1. Second, he objects to the finding in paragraph 17 in so far as it suggests that "the scope of the consent was not limited to a search for Defendant." *Id.* at 2. Third, Mr. Gardiner objects to the finding in paragraph 18[1] in so far as it suggests that "[w]hen the officers pointed out their observations to Ms. Barry, and asked Ms. Barry whether anyone was in the attic, she said no." *Id.*

---

[1]      Mr. Gardiner states that he objects to the proposed finding at paragraph 19 but quotes the finding from paragraph 18. Later, in his discussion, Mr. Gardiner confirms that he believes the factual finding from paragraph 18 is flawed: "This conclusion fails when measured against the flawed factual finding that Ms. Barry was 'asked by officers whether anyone was in the attic.'" *Def.'s Objs.* at 2. The Court infers that Mr. Gardiner objects to the finding in paragraph 18, not 19.

### 1.    Individual Running from Rear of the House

The Magistrate Judge stated in his recommended decision that "[a]s [Deputy Roy] walked to the back of the property, he observed an individual who appeared to be running from the rear of the house." *Rec. Dec.* ¶ 15.  He later discussed this finding and concluded that this fact, among others, "would have been sufficient to establish probable cause in support of a search warrant." *Rec. Dec.* at 8.  The Magistrate Judge further stated that he was "satisfied the officers would have secured the property, requested and obtained a search warrant, and conducted a search that would have revealed the gun confiscated during the search," and therefore concluded that the evidence "would have been discovered by a means that does not offend the protections of the Fourth Amendment." *Id.*

Mr. Gardiner objects to this factual finding arguing that "Deputy Roy's testimony did not contain facts supporting this conclusion." *Def.'s Objs.* at 1.  He goes on to say that the Court's finding, "while perhaps inferred from that and other facts, is not directly supported by any witness's testimony." *Id.*

The Court overrules Mr. Gardiner's objection.  The objection is based on a fallacy.  Contrary to Mr. Gardiner's position that the factfinder in a suppression hearing must consider only direct evidence, the Magistrate Judge and this Court, as factfinders, are permitted to draw reasonable inferences from the evidence; direct support for facts is not required.  *See United States v. Ortiz*, 966 F.2d 707, 712 (1st Cir. 1992) (permitting factfinders to "draw reasonable inferences from the evidence based on shared perceptions and understandings of the habits, practices, and inclinations of human beings"); *see also United States v. Brown*, 621 F.3d 48, 55 (1st

Cir. 2010) ("[Underlying] factual findings are reviewed for clear error, giv[ing] due weight to inferences drawn from those facts by resident judges"); *United States v. Espinoza*, 490 F.3d 41, 46 (1st Cir. 2007) ("[I]f the district court chooses to draw a reasonable (though not inevitable) inference from a particular combination of facts, that inference is entitled to deference").

The Magistrate Judge's proposed finding is a reasonable inference from the record evidence.  First, the Magistrate Judge's finding does not state that Deputy Roy did, in fact, see an individual run from the rear of the house; it states that "he observed an individual who *appeared* to be running from the rear of the house."  *Rec. Dec.* ¶ 15 (emphasis supplied).  This inference is supported by Deputy Roy's testimony in which he said that as he returned to position himself at the back of the property, "somebody ran from just behind me in the treeline and off toward the neighbor's property."  *Suppression Tr.* 102:24-103:5.  Deputy Roy also testified that he heard "a lot of loud crashing, tree branches breaking," *id.* 103:8-9, and that he saw "one male subject running across the front of [the neighboring] property and around to the back on the far side."  *Id.* 103:11-13.

Additionally, before Deputy Roy moved to the back of the property and saw the individual running, he was talking to Ms. Barry at the door and heard a male's voice from inside the residence tell Ms. Barry not to let the officers in.  *Id.* 99:22-100:20.  Ms. Barry told Deputy Roy the male was Forrest, another roommate.  *Id.* 100:21-24.  Although Ms. Barry testified that she thought that she and her son were the only ones home, and that she did not remember if the deputies asked her if anyone exited

the house, *Ctd. Suppression Tr.* 42:16-43:7, she stated in her interview with Deputy Allen later in the evening after the search that Forrest was in the residence when the police arrived and that "I know he took off because obviously he's not in the house." *Gov't's Resp. to Def.'s Mot. to Suppress* Attach. 4 *Interview of Angela Barry by Deputy Ryan Allen on 11/13/14 at 20:45* at 1–2 (*Barry Interview*).

Based on the fact that Deputy Roy heard a male's voice from inside the home, and shortly thereafter heard the sound of tree branches breaking and saw a male individual running from behind the property, and the fact that Ms. Barry confirmed that a male "took off," the Magistrate Judge's inferential finding that Deputy Roy saw an individual who appeared to be running from the rear of the house is reasonable and supported by the evidence.

### 2.    The Scope of the Consent

The Magistrate Judge stated in his recommended decision that "[c]ontrary to Defendant's assertion, the scope of the consent was not limited to a search for Defendant." *Rec. Dec.* ¶ 17.   The Court noted that there is conflicting evidence surrounding the scope of the search but that "the officers' testimony is more credible." *Id.* ¶ 17 n.2.   Later in his discussion, the Magistrate Judge explains that "Sergeant Sheehan credibly testified that the scope of the search was not limited" and that "[t]he officers' conduct during the search, and Ms. Barry's response, or lack thereof, to the scope of the search are consistent with Sergeant Sheehan's testimony." *Id.* at 6.   He states that "[l]ogic suggests that had Ms. Barry limited the consent as Defendant maintains, she would have objected to the scope of the officers' search" and therefore

9

concludes that the consent included consent to search the attic and consent to search for firearms. *Id.* at 6–7.

Mr. Gardiner objects to this finding, stating that "Ms. Barry swore under oath that the Deputy asked her for permission to search the home for the Defendant and that she gave consent for that quest. Indeed, her live testimony repeated and reaffirmed that position." *Def.'s Objs.* at 2.

There is a conflict in the evidence concerning whether the scope of the consent to search was limited to a search for persons only. In her affidavit, Ms. Barry testified that the officers asked her consent to search the home for the presence of persons only. *Aff. of Angela Barry* ¶¶ 6, 13 (ECF No. 31). Ms. Barry's testimony reaffirmed that she consented to a search for persons only. *Ctd. Suppression Tr.* 11:10-11, 12:3-5, 53:17-54:2.

According to the officers, however, the search was not limited to persons only. Sergeant Sheehan testified that "[Ms. Barry] said that we could go in and search the residence. I then asked her to explain further about the firearms inside the residence." *Suppression Tr.* 134:11-13. Deputies Allen and Roy testified that Sergeant Sheehan advised them that Ms. Barry had given consent to search the residence. *Id.* 28:14-25, 104:17-19. The fact that the search was not limited is also reflected in the officers' reports written the day after the incident. *Gov't Resp. to Def.'s Mot. to Suppress* Attach. 1 *Free Form Narrative by James E. Roy* at 3 (*Roy Report*) ("SHEEHAN advised the roommate, MARSHALL had spoken with BARRY and they agreed to give consent to search the home for firearms and the presence of

GARDINER"); *id.* Attach. 2 *Suppl. Narrative by R. Allen* at 2 (*Allen Report*) ("When I returned to the residence we were given consent to search the residence"); *id.* Attach. 3 *Suppl. Narrative by William Sheehan* at 2 ("Angela then stated that I could search the residence if I wanted to.  I told Angela that we will search it when the other Deputies return").

Where there is conflicting testimony, a factfinder is empowered to make a determination based on the witnesses' credibility.  The Magistrate Judge credited Sergeant Sheehan's testimony that the scope of the consent was not limited.  *Rec. Dec.* at 6.  In performing its de novo determination under § 636(b)(1), the Court has the authority to recall the witnesses to assess their credibility regarding the scope of the consent.  *See United States v. Raddatz*, 447 U.S. 667, 676 (1980) ("If [the district court] finds there is a problem as to the credibility of a witness or witnesses or for other good reason, it may, in the exercise of its discretion, call and hear the testimony of a witness or witnesses in an adversary proceeding") (quoting H.R. Rep. No. 94-1609, at 3–4) (alteration in original) (emphasis omitted).  However, Mr. Gardiner gives the Court no reason to do so.  He points to no reason why Ms. Barry is more credible than the officers.  Indeed, Ms. Barry's memory during her testimony was weak, *see Ctd. Suppression Tr.* 49:2-12, and she contradicted herself during her live testimony.  *Compare id.* 16:9-11 ("Q: And is [the attic] an area that you knew existed prior to that day? A: No"), *with id.* 54:17-21 ("Q: Prior to this occasion, you'd lived there at this house a couple years, right? A: Right. Q: You knew the attic was there, right? A: Yes").  She also made statements during her interview shortly after the

11

search of the residence that conflicted with her live testimony at the suppression hearing.  *Compare Barry Interview* at 1 ("Allen: Who else was in the residence at the time we arrived?  Barry: It was Forrest and Jenny came"), *with Ctd. Suppression Tr.* 8:4-8 ("Q: And to your knowledge, was anybody else home at the time? . . . A: There was me and my son").

Nor does it make sense in the context of the law enforcement investigation that the search would be limited to persons.  The deputies were investigating a possible gun crime.  The complaint was about gun fire coming from the house at 184 Lakeview Drive.  By the time the deputies asked for permission to search the house, they had learned: (1) that there was a shooting target in the back of the property, (2) that there were shell casings in that area, (3) that both Ms. Barry and Mr. Gardiner were convicted felons, (4) that there was an outstanding arrest warrant for Mr. Gardiner, (5) that a male voice had come from inside the house, telling Ms. Barry not to let the deputy into the house without a warrant, and (6) that someone appeared to run from the rear of the house.  Although the deputies may have been interested in finding Mr. Gardiner to execute the arrest warrant, they were obviously also at least as interested in whether there were firearms in the house.  In this context, it is reasonable for the Magistrate Judge to have found, as he did, that Ms. Barry's consent was not limited to a search of the house for persons.

Having had the advantage of observing the witnesses during their testimony, including direct, cross, and redirect examination, the Magistrate Judge credited the truthfulness of the officers' testimony as to whether Ms. Barry limited the consent of

the search.   On this record, the Court finds no reason to doubt the officers'
truthfulness, nor any reason to doubt the Magistrate Judge's ability to assess it.  The
Court overrules Mr. Gardiner's objection.

### 3.   Questioning Ms. Barry about the Attic

The Magistrate Judge stated in his recommended decision that "[w]hen the
officers pointed out their observations to Ms. Barry, and asked Ms. Barry whether
anyone was in the attic, she said no." *Rec. Dec.* ¶ 18.  He discusses this finding:

> Significantly, Ms. Barry could see the officers in the bedroom, was
> informed about the officers' findings in the closet, was asked by the
> officers whether anyone was in the attic, yet did not raise any objections
> to the scope of the search.   Logic suggests that had Ms. Barry limited
> the consent as Defendant maintains, she would have objected to the
> scope of the officers' search.

*Rec. Dec.* at 6.

Mr. Gardiner objects to this factual finding.   He states that Deputy Roy
testified that Ms. Barry was in the living room with her son while he was searching
the bedroom area and that Ms. Barry indicated that she could not see the closet area
from her location and could not see Deputy Roy accessing the attic.  *Def.'s Objs.* at 2.
He also states that Deputy Roy did not testify that he sought permission or approval
from Ms. Barry or that he asked Ms. Barry about the attic before accessing it himself.
*Id.*

Mr. Gardiner is correct that neither of the deputies, nor Ms. Barry, provided
any testimony during the suppression hearing concerning whether the officers
pointed out their observations about the attic to Ms. Barry or whether they asked her
if anyone was in the attic.  *See Suppression Tr.* 30:11-33:20, 105:10-106:16, 115:20-

13

117:12; *Ctd. Suppression Tr.* 16:7-21:23.  However, Deputy Roy and Deputy Allen's reports, written the day after the incident, do reflect this fact.  *See Roy Report* at 3 ("There was a 2' x 2' attic access panel above the closet that also had insulation debris hanging out of it.  It appeared the disturbance was recent.  We then questioned BARRY about this and she stated she did not know why anyone would have been up there or used the attic space"); *Allen Report* at 2 ("We could see that the panel to the attic also had insulation jammed into it.  Deputy Roy and I pointed this out to Angela. We asked her if anyone was in the attic.  She told us that there was not").  Nothing in the witnesses' testimony at the hearing contradicted these facts from the reports. The Court overrules Mr. Gardiner's objection to the finding in paragraph 18.

### B.   Legal Objections

Mr. Gardiner argues that the Magistrate Judge's conclusion that "'[l]ogic suggests that had Ms. Barry limited the consent as Defendant maintains, she would have objected to the scope of the officers' search,' is unsupported and clearly erroneous." *Def.'s Objs.* at 3.  The Defendant also objects to the Magistrate Judge's legal conclusion that consent to search the residence includes the attic.  *Id.*  Finally, the Defendant objects to the Magistrate Judge's application of the inevitable discovery doctrine to these facts.  *Id.* at 4.

#### 1.   Search Not Limited in Scope

The Fourth Amendment protects "the right of the people to be secure against unreasonable searches and seizures of their persons, houses, papers and effects." *United States v. Carrasco*, 540 F.3d 43, 49 (1st Cir. 2008).  "The Fourth Amendment generally requires the police to obtain a warrant before entering and searching a

14

person's home." *United States v. Meada*, 408 F.3d 14, 20 (1st Cir. 2005). As law enforcement did not obtain a search warrant, the search of Mr. Gardiner's home is "presumptively unreasonable." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). Nevertheless, the presumption "can be overcome." *Id.*

One exception to the warrant requirement is consent. "It is a fundamental principle of Fourth Amendment law that a warrantless search may be conducted with the voluntary consent of a person authorized to give such consent." *United States v. Chaney*, 647 F.3d 401, 405–06 (1st Cir. 2011) (citing *United States v. Stierhoff*, 549 F.3d 19, 23 (1st Cir. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973))). "'Consent searches are part of the standard investigatory techniques of law enforcement agencies' and are 'a constitutionally permissible and wholly legitimate aspect of effective police activity.'" *Fernandez v. California*, 134 S. Ct. 1126, 1132 (2014) (quoting *Schneckloth*, 412 U.S. at 231–32).

However, a warrantless search may not exceed the scope of the consent communicated by the consenting party. *Chaney*, 647 F.3d at 406. The scope of consent is measured by an objective standard, i.e., what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "[Courts] therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." *United States v. Marshall*, 348 F.3d 281, 286–87 (1st Cir. 2003) (quoting *United States v. Melendez*, 301 F.3d 27, 32 (1st

Cir. 2002)).  Consent may be "express or inferred from conduct," also called "implied-in-fact consent."  *United States v. Winston*, 444 F.3d 115, 121–22 (1st Cir. 2006).

The Magistrate Judge concluded that the scope of Ms. Barry's consent to search the residence was not limited to persons and included the attic.  He based his conclusion in part on Sergeant Sheehan's testimony that the consent was not limited, which he found to be more credible than Ms. Barry's contrary testimony.  Additionally, the Magistrate Judge concluded that "had Ms. Barry limited the consent as Defendant maintains, she would have objected to the scope of the officers' search."  *Rec. Dec.* at 6.

Mr. Gardiner argues that Ms. Barry was not aware of the actual search scope and therefore her failure to object to the scope is evident:

> Ms. Barry was in the living room and had a limited vantage point to see what Roy was doing.  She did not see him as he stood atop a stool and entered into the attic.  Nor, did Roy notify her that he was doing so.  Hence, she was in no position to have to have (sic) objected as she didn't know what was happening.  Roy only notified her after he removed the gun case from the attic.

*Def.'s Objs.* at 3.

The Court disagrees with Mr. Gardiner that the scope of Ms. Barry's consent was limited.  As already discussed, the Court accepts the Magistrate Judge's finding that Ms. Barry's express consent was not limited to persons only.  Moreover, even if the scope of Ms. Barry's express consent was limited to a search of the residence for persons as Mr. Gardiner contends, the officers' decision to search the attic would not have exceeded that scope.  Deputies Roy and Allen both testified that they believed that someone may be hiding in the attic space, *Suppression Tr.* 31:3-5, 106:2-8, which

is a reasonable belief given the insulation debris on the floor under the attic and lodged in the panel.

Additionally, the Court concludes that the scope of Ms. Barry's consent to search the residence extended to the attic.  Mr. Gardiner argues that legally, consent to search the residence does not include consent to search the attic.  *Def.'s Objs.* at 3–4.  He points out that the First Circuit has not directly addressed the issue and distinguishes the facts of this case from those in the cases relied upon by the Magistrate Judge because here, the attic was not a living quarter and was not readily accessible.  *Id.*

Although the First Circuit has not explicitly held that consent to search a residence includes attics, the United States Supreme Court and the First Circuit have established the general test for determining the scope of consent: what the typical reasonable person would have understood by the exchange between the officer and the suspect.  *Jimeno*, 500 U.S. at 251; *Chaney*, 647 F.3d at 406.  In the context of this test, as the Magistrate Judge points out, courts have interpreted consent to search a residence to include consent to search attached spaces, like basements and attics.  *J. of the Ct. of Appeals for the First Circuit* at 1, *United States v. McCurdy*, No. 06-cr-80-JAW (D. Me. Nov. 16, 2010), ECF No. 218 ("There is also no clear error in the district court's finding that Sawtelle's consent to the search of the attic was validly inferred from her conduct"); *United States v. Winston*, 444 F.3d 115, 120–21 (1st Cir. 2006) (scope of protective sweep of basement deemed constitutional); *see also United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008); *United States v. Dominguez*,

911 F. Supp. 261, 262–63 (S.D. Tex. 1995), *aff'd*, 103 F.3d 126 (5th Cir. 1996); *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997). Mr. Gardiner's argument that the facts of these cases are different is not persuasive. The attic in this case may not have had stairs, but it was still readily accessible. The entrance was a two-by-two pop panel and insulation was lodged into the panel, as well as present on the clothing underneath, as if someone had recently accessed the space. *Suppression Tr.* 30:17-31:11. All that Deputy Roy required to see into the attic was a chair. *Id.* 31:16-17.[2]

Moreover, the fact that Ms. Barry's consent extended to the attic can be implied from her conduct. As the Court already discussed, the evidence supports the Magistrate Judge's finding that the officers pointed out their observations about the attic to Ms. Barry and asked her if anyone was in the attic, and she replied no. In addition, Ms. Barry herself testified that she could see into the closet from the living room where she was positioned. *Ctd. Suppression Tr.* 20:1-6. Although at one point during the suppression hearing Ms. Barry testified that she was not aware that the officers had accessed the attic area, *id.* 20:7-12, she testified shortly thereafter that she did not remember if, at any point in time, she could see them accessing the attic. *Id.* 21:18-23. Both Deputy Allen and Deputy Roy testified that Ms. Barry was in their vicinity and could see them during the search of the attic but never objected. *Suppression Tr.* 31:14-24, 33:5-20, 108:1-17, 115:20-116:12. Given the conduct of the officers and Ms. Barry, as well as Ms. Barry's express consent and failure to object

---

[2]      Additionally, albeit not exactly on point, the First Circuit has concluded that an attic was part of the apartment in the context of a search warrant that read "30 Pekin Street, 2nd floor apartment and basement." *United States v. Ferreras*, 192 F.3d 5, 8, 10–11 (1st Cir. 1999).

during the search of the attic, the Court agrees with the Magistrate Judge that the consent was not limited.

### 2.    Inevitable Discovery Doctrine

The Defendant also objects to the Magistrate Judge's application of the inevitable discovery doctrine to the facts of this case.   The Magistrate Judge concluded that even if the consent was limited in scope, exclusion of the evidence would not be warranted because the officers had probable cause to obtain a search warrant and would have done so if consent had not been granted.  *Rec. Dec.* at 7–8. The Defendant argues that the inevitable discovery doctrine only applies when there is "some actual evidence that pursuit of a warrant was active, ongoing, or even initiated." *Def.'s Objs.* at 4.

In *Nix v. Williams*, 467 U.S. 431 (1984), the United States Supreme Court adopted the inevitable discovery doctrine as an exception to the exclusionary rule.  *Id.* at 448.  The government bears the burden of demonstrating by a preponderance of the evidence that the evidence that was obtained by unlawful means would have been inevitably secured in some other lawful way.  *Id.* at 444.  The First Circuit has established a test to determine whether the inevitable discovery rule operates to bar suppression of evidence: "(i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).

In the context of search warrants, the First Circuit has explicitly rejected Mr. Gardiner's "ongoing" test in favor of a more flexible analysis. *See United States v. Silvestri*, 787 F.2d 736, 746 (1st Cir. 1986). At the same time, the *Silvestri* Court suggested that where a warrant is never obtained, as is the case here, the doctrine may require active pursuit of the alternative investigation to be underway. *Id.* Ultimately, the *Silvestri* Court found that even though the search warrant process was not initiated at the time of the unlawful search, because the search warrant was obtained afterwards, the tainted evidence inevitably would have been discovered. *Id.*

Since *Silvestri*, the First Circuit has addressed the application of the inevitable discovery doctrine in the context of search warrants in at least two other cases: *United States v. Hughes*, 640 F.3d 428 (1st Cir. 2011) and *United States v. Jadlowe*, 628 F.3d 1 (1st Cir. 2010). In both of these cases, although the officers did not have a search warrant at the time of the search, they eventually sought and obtained warrants, and the First Circuit concluded that the district court properly applied the inevitable discovery doctrine. *See Jadlowe*, 628 F.3d at 7, 12; *Hughes*, 640 F.3d at 440–41.[3]

Mr. Gardiner's case is a harder one because no search warrant was ever sought or obtained. In *Silvestri*, the First Circuit distinguished between those cases in which

---

[3]      In 1991, a judge from this District extended the *Silvestri* case and applied the inevitable discovery doctrine to a situation in which an officer had probable cause and could have gotten a warrant but did not. *United States v. Thurston*, 774 F. Supp. 666, 668–69 (D. Me. 1991). Other district courts in this Circuit have reached the opposite conclusion, reasoning that the fact that an officer could have obtained a warrant is too speculative and would weaken the Fourth Amendment's protections. *See United States v. Torres*, 274 F. Supp. 2d 146, 162–63 (D.R.I. 2003); *United States v. Matthews*, No. 05-10073-NG, 2006 U.S. Dist. LEXIS 7701, at *23–24 (D. Mass. Mar. 1, 2006).

a search warrant is eventually obtained and those in which a search warrant is never

obtained:

> [T]he application of the inevitable discovery rule where no warrant is in
> fact obtained would substitute proof by a preponderance of the evidence
> that a warrant could and would have been obtained for the requirement
> of the fourth amendment that a warrant must in fact be obtained
> through a neutral and detached magistrate prior to a search.  Such an
> approach substantially weakens the protection provided by the fourth
> amendment.
> . . .
> The stakes are somewhat different in cases where a warrant has been
> obtained subsequent to the illegal search.  The fact that a warrant has
> been obtained removes speculation as to whether a magistrate would in
> fact have issued a warrant on the facts and also ensures us that the
> fourth amendment has not been totally circumvented.

*Silvestri*, 787 F.2d at 744–45.

Here, the absence of a search warrant raises the puzzling question of whether

the officers would have done something they wrongly thought they did not need to do.

Here, the officers testified that they would have sought a search warrant had Ms.

Barry not given them consent to search the property.  *Suppression Tr.* 49:16-55:18.

The Magistrate Judge credited the officers' testimony, noting that the nature of the

investigation and the fact that there were three law enforcement officers on site

supported the fact that the officers would have secured the property and requested a

search warrant had they not received consent.  *Rec. Dec.* at 8.  The Magistrate Judge

also concluded that given all of the facts known to the officers when they obtained

consent, there would have been sufficient probable cause in support of the search

warrant.  *Id.*  Specifically, the Magistrate Judge noted:

> When they obtained consent for the search, the officers had received a
> report that shots had been fired on the property; the officers knew that

Defendant and Ms. Barry, occupants of the home, were convicted felons and thus prohibited from possessing firearms; the officers had located a shooting target area on the property; the officers found empty shell casings on the property; the officers were aware there was an outstanding warrant for Defendant's arrest; one of the officers heard a male voice in the house despite Ms. Barry's assertion that Defendant was not present; and the officers observed at least one person flee from the house.

*Id.*

The Court concurs with the Magistrate Judge that the Government satisfied the first two elements of the *Zapata* test.  In the circumstances of this case, where the deputies were concerned that one or two of the residents had unlawfully possessed and perhaps shot a firearm and had sufficient facts to establish probable cause in support of a search warrant, it is highly unlikely that they would have just walked away without attempting to secure a search warrant to determine whether there were firearms in the house, or that they would have deliberately conducted an illegal warrantless search and risked having all of the evidence excluded.  Therefore, "(i) the lawful means of discovery are independent and would necessarily have been employed, [and] (ii) discovery by that means is in fact inevitable." *Zapata*, 18 F.3d at 978.

This leaves the third element—whether "application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." *Id.*  This is a most serious concern.  The right of the people to be secure against unreasonable searches guaranteed by the Fourth Amendment is among the most fundamental and important rights in the Bill of Rights, and central to the protections of the Fourth Amendment is the warrant requirement. *Mincey v. Arizona* , 437 U.S. 385, 390 (1978)

("[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions'") (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *Ker v. State of California*, 374 U.S. 23, 32 (1963) ("Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom.   That safeguard has been declared to be as of the very essence of constitutional liberty the guaranty of which is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen") (quotations omitted).   Taken to an extreme, the inevitable discovery exception could subsume the warrant requirement, making the exception the rule, and eroding the rights guaranteed by the Fourth Amendment.  *See Johnson v. United States*, 333 U.S. 10, 14 (1948) ("Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent").

In the circumstances of this particular case, the Court concludes that there is not a danger that the doctrine's application will "provide an incentive for police misconduct or significantly weaken fourth amendment protections." *Silvestri*, 787 F.2d at 744.  The Magistrate Judge found that the officers received consent to search

from Ms. Barry and relied upon that consent in making the decision not to obtain a search warrant.  They did not purposefully circumvent the Fourth Amendment. *Carrasco*, 540 F.3d at 49 ("[S]o long as law enforcement officers reasonably believe that the person who gives consent has the authority to do so, they may rely on that consent").  The situation would be starkly different if the officers illegally searched the home and sought to justify an otherwise illegal search by claiming that they could have and would have sought and obtained a search warrant all along.

## IV.   CONCLUSION

The Court concludes that the warrantless search and seizure was valid under the Fourth Amendment.  The Court AFFIRMS the Magistrate Judge's Recommended Decision on the Motion to Suppress (ECF No. 59) for the reasons set forth in that decision as further explained here.  The Court DENIES Mr. Gardiner's Motion to Suppress (ECF No. 30).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of March, 2017

24